UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


THE CHARTER OAK FIRE                                CIVIL ACTION
INSURANCE COMPANY and
TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA, as subrogees
of WRIGHT BROS., LLC.

VERSUS                                              NO: 2:21-1486

BREMERMANN MECHANICAL, INC.,                        SECTION: T (4)
SIEMENS INDUSTRY, INC., KINSALE
INSURANCE COMPANY, and HDI
GLOBAL INSURANCE COMPANY.


## ORDER AND REASONS

Before the Court are three Motions for Summary Judgment filed by Defendants Bremermann Mechanical, Inc. ("BMI"), Siemens Industry, Inc. ("Siemens"), Kinsale Insurance Company ("Kinsale"), and HDI Global Insurance Company ("HDI"). R. Docs. 185, 186, 187. For the following reasons, the motions are **GRANTED**.

## BACKGROUND

This years-long litigation asks who is responsible for a water leak from a drain valve (the "Subject Valve") on the tenth floor of the Hale Boggs Federal Building. Plaintiffs, The Charter Oak Fire Insurance Company ("Charter Oak") and Travelers Property Casualty Company of America ("Travelers"), are subrogees of Wright Bros., LLC ("WB"), the general contractor. Defendants are BMI and Siemens, the subcontractors, (collectively, "Subcontractors") and their insurers, HDI and Kinsale.

1

A.  **Factual History**

The United States General Services Administration ("GSA"), the building owner, and WB contracted for WB to serve as the general contractor to create office space on the tenth floor of the building (the "Project"). Under the general contract, WB was responsible for providing all materials, services and labor to both design and construct the office space. R. Doc. 185-3. There are two relevant subcontracts. On September 19, 2019, WB subcontracted with BMI to provide HVAC installation on the Project ("WB-BMI Subcontract"). R. Doc. 201-2. On October 10, 2019, BMI subcontracted with Siemens to provide products and services to facilitate the installation ("BMI-Siemens Subcontract"). R. Doc. 185-4 at pp. 15-19.

As part of its work, Siemens provided mechanical submittals to BMI starting on October 14, 2019 ("the Submittal"). R. Doc. 185-6. The Submittal contained technical data and diagrammatic representations of a Nexus Model BD-025 Blowdown/Drain Valve (the "Subject Valve" or generally, the "drain valve") that was incorporated into a Nexus UltraY Model UY Ball Valve, Y-Strainer (the "y-strainer"), and the Subject Valve's associated thread cap (the "cap(s)"), (collectively, the "Valve System"). *Id*. Five Valve Systems were to be installed in the tenth-floor ceiling. All systems used composite caps. Plaintiffs introduced evidence from the Valve System's manufacturer that the installed composite caps or any caps on the Valve System ***were not designed to contain water flow***. R. Doc. 218-1 at p. 9 (emphasis supplied); R. Doc. 218-16 (information from the drain valve manufacture stating "the cap **IS NOT** designed to contain flow"); R. Doc. 218-18 ("[n]or is the brass cap" intended to hold water pressure). Plaintiffs' expert, Joseph Kresovsky, explained: (a) that the manufacturer designed the caps to protect the threads on the

2

drain outlet and to catch drips, rather than hold pressure, and (b) that the Project's specifications do not expressly require brass caps over composite caps. R. Doc. 218-9 at p. 16.

On October 24, 2019, after Siemens transmitted two submittals to BMI, BMI provided a submittal to WB for approval. WB referred this submittal to its selected engineer, Griffith Engineering ("Griffith"), and GSA for review and approval. Griffith reviewed this submittal. It is also undisputed that WB returned it to BMI and the submittal contained 40 pages related to the Project. R. Doc. 185-6 at pp. 98-145. On December 26, 2019, WB then directed BMI to purchase all necessary equipment—including the Subject Valve that was incorporated into the y-strainer. *Id.* at pp. 12-17.

BMI began installation of the Valve System—including the Subject Valve with a composite cap (the "Subject Cap") on June 10, 2020. WB's site superintendent, Donny Phillips, supervised the installation. Phillips, as WB's Quality Assurance and Quality control representative, was responsible for ensuring that all work complied with the plan specifications, and contract documents. R. Doc. 185-9 at pp. 10-11. The supply, return, valves and VAV connections were all pressure tested in front of Phillips and no leaks were detected. *Id.* at pp. 14-15. Plaintiffs, however, dispute whether BMI performed the test as required under Project specifications. R. Doc. 218-1 at pp. 13-14. GSA marked that the work was completed on June 24, 2020. No party has directed the Court to evidence refuting that, when BMI finished the installation, the Subject Valve was closed and the Subject Cap was secured onto the Subject Valve. Phillips

3

accepted BMI's work on June 24, 2020, as "necessarily being completed."[1] Phillips testified that he evaluated all valves and ensured the work was in conformity with the Project's specifications. R. Doc. 185-9 at pp. 22-25. He did not identify any leaks. Phillips also testified that: (a) he knew the Subject Cap was properly attached to the Subject Valve, (b) the Subject Cap was a composite cap, and (c) composite caps are routinely used on drain valves. *Id.* at p. 64.

From June 10, 2020, to August 7, 2020, it is undisputed that multiple other entities performed work within inches to feet of the Subject Valve. *See, e.g.*, R. Doc. 185-9 at pp. 31 (testifying to some work that was performed within *inches* of the Subject Valve). On August 7, 2020, Siemens employee Robert Sparks performed work in the tenth-floor ceiling on a different piece of equipment that was located about three feet *away* from the Subject Valve. The record testimony indicates that the other entities, mostly, performed their work *closer* to the Subject Valve than Sparks's work. *See, e.g.*, R. Doc. 185-9 at pp. 31, 35, 40. Phillips was present during Sparks's work. *Id.* at pp. 67-69. Sparks testified that he did not touch the Subject Valve, because his work did not require him to have any contact with it, and that he saw no water discharge. R. Doc. 185-10 at pp. 19-20. Sparks also worked on the other side of the light fixture and at a different angle than the Subject Valve. Expert testimony shows that Sparks could not have physically reached the

---

[1] Plaintiffs assert that WB did not accept Subcontractors work as complete but rather only suggested it was "necessarily [] complete" or "substantially complete prior to the Incident." However, these assertions are irrelevant because Plaintiffs do not point the Court to any evidence that Subcontractors had any more work to do for the valve system. Rather the alleged uncomplete work belonged to WB, as they had "doors to replace, paint to complete, and had not even developed a punch list." *See* R. Doc. 218-1 at p. 19.

Subject Valve from his location, let alone opened the Subject Valve.[2] R. Doc. 185-17. Phillips also testified that he did not see Sparks open or touch the Subject Valve or Subject Cap but that "anyone" could have opened them. R. Doc. 185-9 at pp. 73-74. He also testified that he did not see any leaks or discharges and that Sparks was working on the other side of the light fixture away from the Subject Valve. *Id.* From August 7th onward until the leak, neither BMI nor Siemens did any work in the tenth-floor ceiling. Phillips, however, worked on the tenth floor every day the following week of August 10-August 14. His work required him to enter the tenth floor twice a day. *Id.* at pp. 47-49.

On August 16, 2020, WB received a call from building security about water coming from the tenth floor. When Phillips reported to the site, he found pressured water jetting from the Subject Valve ("the Incident"). Phillips found (a) the Subject Valve was fully open, (b) the Subject Cap removed from the Subject Valve, and (c) water leaking from the Subject Valve. R. Doc. 1, ¶ 34; R. Doc. 185-9 at p. 60-61. The parties do not dispute that the Subject Valve was improperly opened. *See, e.g.*, R. Doc. 218-1 at p. 24 ("BMI's piping was open[ed]"). The building sustained water damage over nine floors. BMI removed the Subject Cap from the Subject Valve and four other caps from four other tenth floor valves. The Subject Cap was examined by representatives of WB, GSA, BMI, and third-party contractor, GCI. *See, e.g.*, R. Doc. 185-15 at pp. 10-12; R. Doc.

---

[2] Plaintiffs attempt to exclude testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* R. Doc. 192; 113 S.Ct. 2786 (1993). If the Court were required to resolve the issue, it would deny the motion. Testimony as to the physical reach capacity in an upper ceiling can accommodate expert testimony because Dr. De Jhong's testimony is based on his (a) engineering expertise, (b) focuses on reach potential in a technical space, something outside the purview of a lay jury, and (c) is based on scientific methodology—reconstructive and biomedical literature and a tested model.

185-14 at p. 11. All concluded that the Subject Cap suffered *no* damage, including no thread damage. WB was told that the Subject Cap suffered no damage and that there "were no signs…that it [the Subject Cap] was blown off." *See, e.g.*, R. Doc. 185-14 at p. 14. WB reported this information to Plaintiffs, its insurers. *Id.*

Two days after the Incident, BMI recovered five caps from the five valves on the tenth floor ("the recovered caps"). R. Doc. 218-10 at pp. 87-88. The parties do not dispute that one of the recovered caps is the Subject Cap. All who reported to the leak thought it was an undamaged cap. However, BMI did not index the specific cap it recovered from the Subject Valve. *Id.* The parties agree that four out of the five caps were undamaged. However, one cap had a small longitudinal crack on its side. R. Doc. 185-19 at p. 17. There is, nonetheless, no evidence that this cap suffered any thread damage. *Id.*; R. Doc. 185-18 at p. 9. In fact, none of the recovered caps suffered thread damage. Plaintiffs' expert, Joseph Kresovsky, conceded: (a) that none of the five caps suffered thread damage, (b) that if the Subject Cap was installed to the Subject Valve at the Incident, it would have sustained thread damage, and (c) that if the Subject Cap was found undamaged, it was not in place on the Subject Valve at the time the water release started. R. Doc. 185-19 at pp. 10-13, 15-17. Defendants' expert, Eric Benstock, came to the same conclusion: because *none* of the recovered caps has thread damage, *none* of the five caps was on the Subject Valve at the time of the Incident. R. Doc. 185-18 at pp. 16-17 (emphasis supplied).

It is not disputed that the y-strainer, drain valve combination was appropriate for this HVAC unit—including the Subject Valve. *See generally* R. Doc. 218-2. Plaintiffs make no argument that the Subject Valve or y-strainer was defective, but rather, they claim that the

6

Subcontractors opened the Subject Valve, that the Subject Cap blew off or unscrewed itself from the release of water pressure, or that the Subject Cap was defective. *Id.* at p. 22 (asserting "Sparks could have moved the ladder to access the HVAC equipment from another angle [on August 7, 2020], at which point he could have reached the Subject Valve."); *Id.* at p. 24 ("assert[ing] the cap on the Subject Valve could have either blown off the valve or that given enough time in a loose condition, it could have unscrewed itself from the valve while being subjected to 60 psi of pressure"); *Id.* at p. 3, ¶ 9 (submitting that selection of a composite cap rather than a brass cap is a genuine dispute of material fact on causation). Indeed, the Subject Valve with the pre-existing y-strainer was placed back into service the night after the Incident. R. Doc. 185-3 at pp. 33-36. The Project received final approval by GSA with the Subject Valve back in place and was only removed for evidentiary reasons. R. Doc. 185-6 at pp. 30-31; R. Doc. 185-7 at pp 25-26. Four identical drain valve, y-strainer combinations remain in the space to this day. *Id.*

### B. Procedural History

After the Incident, Plaintiffs paid roughly $2,300,000 to the GSA in damages. *See* R. Doc. 1. Plaintiffs in this lawsuit seek to recoup their expenses. Plaintiffs assert Defendants are liable under four causes of action: (1) negligence, (2) breach of contract, (3) declaratory relief, and (4) contractual indemnification. *Id.* BMI first filed a motion to dismiss in which it argued that the Court lacked federal diversity jurisdiction and that the indemnity and insurance provision in the WB-BMI subcontract is unenforceable under the Louisiana Anti-Indemnity Act ("LAIA"). R. Doc. 19. The Court denied the motion to dismiss on grounds that WB's citizenship is immaterial and that LAIA does not apply because Plaintiffs limited their indemnity claim to BMI's or Siemens's

own acts or omissions. R. Doc. 80.

After years of discovery, BMI and Siemens now move for summary judgment on all counts. R. Doc. 185-1. They argue that Plaintiffs do not put forward enough evidence for a jury to conclude that either BMI or Siemens is liable because there is not enough evidence to show their acts or omissions *caused* the Incident. *Id.* at pp. 9-12. Defendants assert Plaintiffs present no evidence that allows a jury to conclude either BMI or Siemens opened the Subject Valve. *Id.* at 12. Indeed, Plaintiffs concede they ***do not know*** who opened the Subject Valve or unscrewed/removed the Subject Cap. *See* R. Doc. 218-1 at p. 23 ("Plaintiffs do not know who opened the [Subject Valve] and [Subject Cap]. That is true.").

Defendants maintain that this concession, coupled with the lack of evidence, is enough to warrant summary judgement. They point out that Plaintiffs do not allege the Subject Valve was faulty but admit instead the Subject Valve was left open. R. Doc. 185-1 at p. 12. Furthermore, they contend there is no genuine dispute of material fact that the Subject Cap was removed before the Incident. *Id.* at 12-16. Defendants highlight the unrefuted expert testimony that, if the Subject Cap had been blown off, unscrewed itself, or was otherwise dislodged due to water pressure exposure, the Subject Cap would have incurred thread damage. *Id.* at p. 13. Because it is undisputed that none of the recovered caps suffered thread damage, Defendants submit that Plaintiffs cannot prove that a defective Subject Cap was the cause of the accident. *Id.* Therefore, they claim that, because the Subject Cap could not have caused the leak, Defendants are not liable. *Id.* at pp. 12-16.

Plaintiffs attempt to establish liability in three ways. R. Doc. 218-1. First, they argue there is a genuine dispute of material fact that either BMI or Siemens opened the Subject Valve, and

because the valve was opened, Subcontractors are responsible. *Id.* at 7. Plaintiffs also attempt to impose liability predicated on the Subcontractors' choice to install a composite cap. Plaintiffs contend that, when tested, a composite cap only withstood 121 psi—less than the 125 psi required for the Valve System under the Project. *Id.* at p. 8. They maintain that a comparable brass cap, however, is designed to meet a greater psi and would have contained the leak. *Id.* at 10-15. They lastly argue that the Subject Cap could have unscrewed itself, was blown off, or was otherwise dislodged when subjected to pressurized water. *Id.* at 16-17.

HDI and Kinsale also move for summary judgment. R. Docs. 186, 187. Kinsale is BMI's insurer and HDI is Siemens's insurer. HDI insured Siemens pursuant to policy number GLD11101-11 (the "Siemens Policy"). R. Doc. 186-5. Siemens is the named insured. The Siemens Policy contains an Additional Insured endorsement that provides additional insured coverage for "Any Person or Organization Required by Written Contract." *Id.* However, coverage is afforded "only with respect to liability arising out of 'your work' [named insured] for that insured by or for you." *Id.* at pp. 1, 7 (identifying Siemens as the named insured). Kinsale insured BMI pursuant to policy number 0100122523-0 (the "BMI Policy"). R. Doc. 187-2. But that policy limits coverage to "liability for 'bodily injury', 'property damage' or 'personal and advertising injury' caused, in whole or in part, by Your [BMI's] acts or omissions." *Id.* p. 70; *Id.* at p. 6 (defining "you" to "refer…to the Name Insured shown in the Declarations."); *id*. at p. 22 (identifying the "Named Insured" as only "BMI").

Both HDI and Kinsale, (the collectively the "Insurers") argue they are not liable to Plaintiffs because the Subcontractors are not liable to Plaintiffs. R. Doc. 186-1 at p. 9; R. Doc.

187-1 at pp. 3-4. Insurers argue that Plaintiffs cannot collect as an additional insured because: (1) Plaintiffs previously limited their action to the Subcontractors' acts or omissions, (2) any other claims are not asserted in the Complaint, (3) the additional insured provision does not apply without evidence BMI or Siemens caused the Incident, and (4) LAIA invalidates any provision in either subcontract that purports to indemnify WB for WB's actions. R. Doc. 186-1 at pp. 5-10; R. Doc. 187-1 at pp. 10-11.

Plaintiffs incorporate their opposition to Subcontractors' motion for summary judgement for the Insurers' motions. R. Docs. 219, 220 at p. 4. Additionally, they argue that: (1) LAIA does not apply, (2) the court should *sua sponte* find the Kinsale policy provides coverage for BMI's acts and omissions, and (3) that the WB-BMI's subcontract requires WB to be an additional insured under the Siemens policy. R. Doc. 219 at pp. 4-5; R. Doc. 220 at pp. 4-6.

## LAW & ANALYSIS

### 1. Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). The court must find "a factual dispute to be 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party and a fact to be 'material' if it might affect the outcome of the suit under the governing substantive law." *Voelkel McWilliams Const., LLC v. 84 Lumber Co.*, 2015 WL 1184148, at *5 (E.D. La. Mar. 13, 2015) (quoting *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996

(5th Cir. 1989)). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact and all reasonable inferences are drawn in favor of the nonmoving party. *Celotex*, 477 U.S. at 323.

After the movant meets his burden, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *Gernain v. U.S. Bank Nat' Ass'n*, 920 F.3d 269, 272 (5th Cir. 2019). In doing so, the non-movant must submit "significant probative evidence" in support of his claim. *State Farm Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). However, "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

2.  **Plaintiffs' Fail to Carry Their Burden That Subcontractors Are Liable Because They Do Not Submit Significant Evidence That Either Opened the Subject Valve.**

Plaintiffs' theories of recovery all require proof of causation. Under Louisiana law, there are five elements to a negligence claim: duty, breach, causation in fact, causation in law, and damages. *Jack v. Evonik Corp.*, 79 F.4th 547, 564 (5th Cir. 2023) (citing *Lemann v. Essen Lane Daiquiris*, Inc., 2005-1095 (La. 2006), 923 So. 2d 627, 633). Cause in fact is generally a "but for" inquiry; if the plaintiff probably would have not sustained the injuries but for the defendant's

11

substandard conduct, such conduct is a cause in fact. *Roberts v. Benoit*, 605 So. 2d 1032, 1042 (La. 1991), *on reh'g* (May 28, 1992).

A breach-of-contract claim in Louisiana has "essential" elements: "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *IberiaBank v. Broussard*, 907 F.3d 826, 835 (5th Cir. 2018) (citing *Favrot v. Favrot*, 68 So.3d 1099, 1108–09 (La. App. 4 Cir. 2011)). A plaintiff has the burden "of proving any damage suffered *by it as a result of a breach of contract*" or "actual damages." *L & A Contracting Co. v. Ram Indus. Coatings, Inc.*, 99-0354, p. 20 (La. App. 1 Cir. 2000), 762 So.2d 1223, 1235 (emphasis added). "Actual damages arising from a breach of contract must be proven; they cannot be merely speculative or conjectural." *Payphone Connection Plus, Inc. v. Wagners Chef, LLC*, 2019-0181 (La. App. 4 Cir. 2019), 276 So. 3d 589, 598 (quoting *LeBlanc v. Gibbens Pools, Inc.*, 447 So.2d 1195, 1197 (La. App. 5th Cir. 1984)). Contractual indemnification claims also require a showing that the indemnitor was actually or partially at fault. *See, e.g.*, *Conrad Shipyard, L.L.C. v. Franco Marine 1 LLC*, 640 F. Supp. 3d 612, 618 (E.D. La. 2022). Courts also find no need for declaratory relief, when like here, the claim is merely duplicative of other causes of action. *In re Trevino*, 615 B.R. 108, 144 (Bankr. S.D. Tex. 2020) (citing *Cypress/Spanish Fort I, L.P. v. Prof'l Svc. Indus., Inc.*, 814 F. Supp. 2d 698, 710 (N.D. Tex. 2011)) (dismissing a plaintiff's request for declaratory relief that was duplicative of the plaintiff's claim for breach of contract on the grounds it was duplicative and unnecessary).

Defendant Subcontractors have satisfied their burden of showing an absence of material fact that no reasonable inference supports that BMI or Siemens opened the Subject Valve. Indeed,

the parties effectively concede that some unknown or unidentified person physically opened the Subject Valve. There is also no dispute that the y-strainer plus Subject Valve complied with Project specifications. WB's systems engineer Griffith reviewed the Subcontractors' plans. No party expressed any objections to the Subject Valve. WB then directed BMI to *purchase* all the materials for the HVAC system—including the Subject Valve. Once again, no objection. WB also supervised BMI's installation of the Subject Valve with the Subject Cap. When the installation on the Valve System was completed on June 24, 2020, Phillips observed, approved, and accepted BMI's work. Contrary to Plaintiffs' argument, Phillips retained his general responsibility to ensure that all subcontractors properly performed their work. *See* R. Doc. 218-2. He also knew that the specific Subject Valve was installed with a composite cap, the Subject Cap. So on June 24, 2020, when BMI last performed any work on the Subject Valve and Cap before the Incident, WB oversaw installation, effectively approved of the Valve System, and saw that the Subject Valve and Subject Cap were closed. Plaintiffs do not point to any work that BMI did on the Valve System after June 24, 2020, and before the Incident that contradicts Defendant Subcontractors' evidence that the Subject Valve was closed and functioning properly.

Plaintiffs offer nothing but rank speculation in rebuttal. At best, their claims contend that, because BMI had a responsibility to install a functioning valve system and did install the Valve System on June 24, 2020, that they *could* have been the party to open the Subject Valve and are thus responsible for the leak. However, without evidence, resolution of the claim would require the factfinder to speculate or assume BMI's liability. The law is clear that "mere speculation will not defeat a motion for summary judgment, and conclusory allegations, improbable inferences,

13

and unsupported speculation are insufficient to support a finding that a genuine issue of material fact exists." *Kinch v. Our Lady of Lourdes Reg'l Med. Ctr.*, 15-603, pp. 7-8 (La. App. 3 Cir. 2015), 181 So.3d 900, 905. Plaintiffs must support their claim with "affirmative evidence" for a jury to conclude that BMI was responsible for the Subject Valve being open. *See, e.g.*, *Robin v. Hebert*, 2012-1417 (La. App. 3 Cir. 2013), 157 So. 3d 63, 68. BMI's presence in the general area is not enough. Other courts have concluded that a party's presence in a construction site is not enough to satisfy causation or trigger indemnification. *See, e.g.*, *Emps. Mut. Cas. Co. v. Amerisure Ins. Co.*, No. 4:18-CV-00330, 2019 WL 3717634, at *6 (E.D. Tex. Aug. 7, 2019) (granting summary judgment because a party's mere presence at a construction site does not raise a genuine dispute of material fact to state that a party caused in whole or in part the injury). Regardless, Plaintiffs do not present any evidence to rebut (a) that BMI installed the Valve System, (b) that the y-strainer drain valve combination was approved, and (c) that BMI did not do additional work which would cause the Subject Valve to be open.

The same conclusion is true for Siemens. Plaintiffs argue that Siemens employee Sparks must have been the one to open the Subject Valve on August 7, 2020. They assert Sparks "could have moved a ladder to access the HVAC equipment from another angle, at which point he *could* have reached the subject valve." R. Doc. 218-2, ¶ 11. But Plaintiffs have not produced any evidence to refute that Sparks did not and could not have touched the Subject Valve, let alone opened it. Sparks testified that he was not performing work on the Valve System but in a different area of the ceiling. R. Doc. 185-10 at pp. 19-20. Therefore, he stated that he did not touch the Subject Valve or the Subject Cap because he had no reason to do so. *Id.* This conclusion is

14

supported by Phillips's testimony and expert testimony. Phillips testified that he did not see Sparks open the Subject Valve or perform any work on the Valve System and that the Subject Valve could have been opened by "anyone." R. Doc. 185-9 at pp. 74-75. Expert testimony also demonstrates that Sparks physically could not have reached the Subject Valve, let alone have opened it. *See* R. Doc. 185-17. Defendant Subcontractors meet their burden to show an absence of a material fact.

Plaintiffs' assertion that Sparks could have moved the ladder to a different angle and could have reached the Subject Valve, R. Doc. 218-2 at p. 22, is not supported by any evidence, direct or circumstantial, and is likewise improbable given the evidentiary record. Plaintiffs must present competent evidence establishing, more likely than not, that Sparks opened the Subject Valve. Yet they cannot point to any evidence beyond Sparks's mere presence in the general area. While Siemens did perform work on August 7, 2020, in the tenth-floor ceiling, it is uncontested that multiple other entities did also—including performing work that was *closer* to the Subject Valve than Siemens. R. Doc. 185-9 at pp. 31, 35, 40. Plaintiffs, instead, concede they do not know who opened the Subject Valve. R. Doc. 218-1 at p. 23. Just as the Court cannot assume other entities are responsible for opening the Subject Valve because they performed work close to the Subject Valve, a jury could not reasonably conclude Siemens opened the Subject Valve on the same evidence.

Plaintiffs attempt to work around these unfriendly facts by focusing on the Subject Cap. The Subject Cap is however immaterial to causation because Plaintiffs concede that the cap, as part of the approved valve system, was not designed to contain water flow and the Incident would not have occurred had the Subject Valve not been opened. The Valve System's manufacturer's

15

installation notes clearly state that "[t]he cap is **NOT** designed to contain flow." R. Doc. 218-1 at p. 9; R. Doc. 218-16. The manufacturer's representative confirmed this is true for a brass cap or a composite cap: "[T]he cap on the [Subject Valve]… is not designed to hold back system pressure. ***Nor is the brass cap***." 218-18 at p. 2 (emphasis added). Plaintiffs do not dispute these statements but in fact introduced these materials. *See* 218-1 at p. 10. Plaintiffs also concede that the Project's specifications did not specifically call for installing a brass cap. *See* R. Doc. 218-9. But most importantly, the record evidence shows, and Plaintiffs do not reasonably dispute, that the Subject Valve was opened, thereby allowing water to pass through it, and that the cap was not designed to contain water flow. *See, e.g.*, 218-1 at p. 24. Any evidence on the Subject Cap—its damage, composition, or installation—is thus immaterial to the issue of causation.

Nevertheless, the Court can quickly dispatch Plaintiffs' alternative liability theories predicated on the Subject Cap. First, Plaintiffs attempt to assert a quasi-design defect claim arguing that Defendants breached their contractual duties because they installed composite caps instead of brass caps. Plaintiffs still fail to satisfy their burden of production on causation because brass caps were *also* not designed to hold water flow in the Valve System. R. Doc. 218-18. Although Plaintiffs put forward evidence that brass caps *can* hold more water pressure than a composite cap, they have not shown that the *Valve System* failed to hold the required water pressure. Plaintiffs' expert witness stated that the Project specifications required only a "hydronic piping *system* capable of withstanding 125 psi." R. Doc. 218-1 at p. 8 (citing R. Doc. 218-3 at 213) (emphasis added). Even assuming a composite cap could only withstand 121 psi, marginally less than 125, that does not mean the system, if the Subject Valve was not improperly opened, failed to withstand 125 psi.

16

Once again, the caps, brass or composite, are not designed to contain water flow in the Valve System. Even so, Plaintiffs do not put forward competent evidence that the Subject Cap caused the leak. The only testing Plaintiffs performed—pressurizing a water line to 55 psi with the Subject Valve open and a composite cap in place—contained flow for more than two weeks and the testing was stopped because no leaks occurred. R. Doc. 218-9 at p. 14. Plaintiffs also do not provide any evidence that the Subject Cap could not withstand the specific water pressure during the Incident and have thus failed to show any defect with the Subject Cap.

Plaintiffs further speculate that, because one of the recovered caps was damaged, this pre-existing damaged cap was on the Subject Valve at the time of the Incident. Plaintiffs assert that the Subject Cap, already damaged, "could have either blown off the [Subject Valve]…[or] unscrewed itself from the valve while being subjected to 60 psi and/or fluctuating pressure valve." R. Doc. 218-2. However, this conclusion is unsupported. It is undisputed that none of the caps had any *thread* damage. *See* R. Docs. 185-18, 19. The damaged cap only had a small longitudinal crack on its side with no damage to the threads. *Id.* Furthermore, Plaintiffs' expert conceded that none of the recovered caps had suffered any thread damage. He also admitted that, if the recovered caps had undamaged threads after the Incident, then the Subject Cap was not on the Subject Valve at the time of the water release or Incident. R. Doc. 185-19 at pp. 10-13, 15-17. Plaintiffs also do not put forward any evidence that a composite cap would fail to withstand fluctuating pressure. Taken together, the uncontested evidence refutes Plaintiffs' theories that the Subject Cap was on the Subject Valve at the time of the Incident.

In short, Plaintiffs have not carried their burden to show that Defendant Subcontractors are

liable for the Incident because all claims fail for lack of causation. There is no evidence beyond mere speculation that BMI or Siemens opened the Subject Valve. Speculation cannot withstand summary judgment. Given that the Subject Valve was opened, that the y-strainer Subject Valve combo complied with the Project's specifications, and that the caps are not designed to contain water flow—the Subject Cap is irrelevant to causation. Even so, Plaintiffs do not present a genuine dispute of material fact that Subcontractors are liable for the Subject Cap. The caps, brass or composite, are not designed to contain water flow, and none of the recovered caps suffered thread damage. Therefore, the Subject Cap could not have been attached to the Subject Valve at the time of the Incident. Accordingly, Plaintiffs do not have sufficient evidence to conclude that Subcontractors' actions or omissions *caused* the Incident. Subcontractors are entitled to summary judgment.

### 3. Plaintiffs Cannot Collect Either As Additional Insured or Under the BMI and Siemens Policies' Indemnity Provisions.

The Court now turns to the Insurers' motions for summary judgment. R. Docs. 186, 187. Kinsale and HDI are entitled to summary judgment because Plaintiffs cannot recover either as an additional insured or under the indemnity provisions in the Siemens or BMI policies.

Plaintiffs, from the outset of the litigation, have limited their claims against the Insureds to apply only to the Subcontractors' acts and omissions. Plaintiffs in their motion to dismiss judicially conceded that: "[t]o be clear, the extent to which Charter Oak and Travelers, as subrogees of [WB], demand indemnity is *limited* to the insurance payments Charter Oak and Travelers have had to pay as a result of the damages caused by *the negligence of BMI and/or its subcontractor, Siemens*

*Industry, Inc. ("Siemens").*" R. Doc. 26. at p. 5 (emphasis added). The Court relied on Plaintiffs' assertion when it denied the motion to dismiss. *See* R. Doc. 80. at p. 7. Because the Court holds that Plaintiffs have failed to prove that Defendant Subcontractors were negligent or liable to Plaintiffs, they cannot recoup under the indemnity provisions in the Siemens or BMI policies.

It is too late for Plaintiffs to change their position and argue that they seek indemnity for others' conduct. A "judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention. A statement made by counsel during the course of trial may be considered a judicial admission if it was made intentionally as a waiver, releasing the opponent from proof of fact" and such admissions are "binding on the party making them." *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001). Any arguments in the opposition to a motion for summary judgment are not before the Court because "a claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court" and should have been raised in an amended complaint before the deadline on November 29, 2021. *See Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 318 (5th Cir. 2024); R. Doc. 25 at p. 2. Regardless, the indemnity provisions in both subcontracts—to the extent they ask Subcontractors to indemnify WB, the general contractor, for WB's negligence—are unenforceable under LAIA. La. R.S. § 9:2780.1(B) (any construction contract "which purports to indemnify, defend, or hold harmless ... the indemnitee from or against any liability for loss or damage resulting from the negligence or intentional acts or omissions of the indemnitee ... is contrary to the public policy of this state and is null, void, and unenforceable.").

Plaintiffs also cannot collect as additional insureds under the BMI or Siemens policy. Both

policies explicitly limit coverage to the named insured's acts or omissions. *See* R. Doc. 187-2 at p. 70 (limiting coverage to "additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for 'bodily injury', 'property damage' or 'personal and advertising injury' caused, in whole or in part, by Your acts or omissions,"); *Id.* at p. 6 (defining "you" to "refer…to the Name Insured shown in the Declarations."); *Id.* at p. 22 (identifying the "Named Insured" as only "BMI"); *see also* R. Doc. 186-5 at p. 1, 7 (coverage is afforded "only with respect to liability arising out of 'your work' [named insured, Siemens] for that insured by or for you."). Because the Court has concluded Plaintiffs fail to raise a genuine dispute of material fact that Defendant Subcontractors' acts or omissions caused the Incident, Plaintiffs cannot recover as an additional insured under the BMI or Siemens policies.

Accordingly,

**IT IS ORDERED** that Defendant Subcontractors' motion for summary judgment, R. Doc. 185, is **GRANTED.**

**IT IS FURTHER ORDERED** that Insurers' motions for summary judgment, R. Docs. 186, 187, are **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' claims are **DISMISSED WITH PREJUDICE.** The Court will enter judgment in favor of Defendants.

**IT IS FURTHER ORDERED** that the pending motions in limine, R. Docs. 184, 190, 192, 194, 196, 197, 198, 199, 200, 201, 202, 203, are **DENIED AS MOOT**.

New Orleans, Louisiana, this 31st day of March 2025.

GREG GERARD GUIDRY
UNITED STATES DISTRICT JUDGE